UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
DENNIS MARTINEZ, *et al.*,                          :
                                                     :
                            Plaintiffs,             :        1:20-cv-03338 (VEC)
                                                     :
            - against -                             :
                                                     :
ANDREW M. CUOMO, in his official capacity as        :
Governor of New York State,                         :
                                                     :
                            Defendant.              :
------------------------------------------------------------ :
                                                     X


**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**


LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY  10005

*Attorney for Defendant*


Andrew Amer
 Special Litigation Counsel
     *of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 4

   A.  The Governor's Daily COVID-19 Press Conferences ........................................ 4

   B.  Plaintiffs' Complaint ..................................................................................... 6

STANDARD OF REVIEW ..................................................................................... 8

ARGUMENT ....................................................................................................... 9

   I.  PLAINTIFFS FAIL TO DEMONSTRATE A CLEAR OR
SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ........................... 9

     A.  There is No Clear or Substantial Likelihood Plaintiffs Will Succeed on
the Merits Because They Fail to Allege Facts that Support a
Reasonable Inference They Are Unable to Access the ASL
Interpretation Already Provided on the Governor's Official Website ...................... 10

     B.  There is No Clear or Substantial Likelihood Plaintiffs Will Succeed on
the Merits Because the Governor's Multiple Accommodations for the
Deaf Are Not Unreasonable Under the ADA and Rehab Act ................................. 14

   II.  PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM
IN THE ABSENCE OF A MANDATORY INJUNCTION ....................................... 22

   III.  THE BALANCE OF EQUITIES DOES NOT TIP IN PLAINTIFFS'
FAVOR .......................................................................................................... 23

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Adelphia Supply USA,* No. 15 CV 5826, 2015 WL 10906060
(E.D.N.Y. Nov. 6, 2015), *aff'd sub nom. Abbott Labs. v. H&H Wholesale
Servs., Inc.,* 670 F. App'x 6 (2d Cir. 2016)........................................................ 8

*Alexander v. Choate*, 469 U.S. 287 (1985) ............................................................... 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................... 10

*Bergamaschi v. Cuomo*, No. 20-cv- 2817, 2020 WL 1910754 (S.D.N.Y. April 20,
2020) ............................................................................................................... 21

*Brooklyn Center for Independence of the Disabled v. Bloomberg*, 980 F. Supp. 2d
588 (S.D.N.Y. 2013)................................................................................... 2, 17

*Disability Rights New York v. New York State*, No. 17-cv-6965, 2019 WL
2497907 (E.D.N.Y. June 14, 2019) ....................................................... 2, 13, 14

*Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189 (2d Cir.
2012) ............................................................................................................... 15

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)........................................ 23

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir. 2005) ......................... 22, 23

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003)................................... 15, 16

*Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326 (2d Cir. 1997) .......................... 10

*Lincoln CERCPAC v. Health and Hosps. Corp.*, 147 F.3d 165 (2d Cir. 1998)........... 16

*Loye v. Cnty. of Dakota*, 625 F.3d 494 (8th Cir. 2010) ....................................... 18, 21

*Matson v. Bd. of Educ.*, 631 F.3d 57 (2d Cir. 2011) ................................ 10, 11, 12, 13

*Midgett v. Tri-County Metro. Transp. Dist.*, 254 F.3d 846 (9th Cir. 2001)........... 16, 20

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286 (2d Cir. 2012) ........ 8

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ............. 8

*North American Soccer League, LLC v. United States Soccer Federation, Inc.*,
883 F.3d 32 (2d Cir. 2018)....................................................................... 8, 9, 14

*Patton v. Dole*, 806 F.2d 24 (2d Cir. 1986) ............................................................. 8

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) ......................................... 10

*Prakel v. Indiana*, 100 F. Supp. 3d 661 (S.D. Ind. 2015) ......................................... 17

*Rodriguez v. City of New York*, 197 F. 3d 611 (2d Cir. 1999) ..................................... 16

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) .......................................................... 23

*Singas Famous Pizza Brands Corp. v. New York Adver. LLC*, 468 F. App'x 43 (2d Cir. 2012) .................................................................................................. 22, 23

*Stauber v. N.Y. City Transit Auth.*, 10 A.D.3d 280 (N. Y. App. Div. 1st Dep't 2004) ........................................................................................................................ 17

*Stephens v. Shuttle Assocs., L.L.C.*, 547 F. Supp. 2d 269 (S.D.N.Y. 2008) ................ 17

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995) ................ 8

*Tsirelman v. Daines*, 794 F.3d 310 (2d Cir. 2015) ..................................................... 10

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ............................................... 23

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156 (S.D.N.Y. 2015) ............................................................................................... 11

*Williams v. City of New York*, 121 F. Supp. 3d 354 (S.D.N.Y. 2015) ................... 15, 17

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ...................... 23

*Wright v. New York State Dep't of Corrections*, 831 F.3d 64 (2d Cir. 2016) .............. 17

**Statutes**

29 U.S.C. § 794 ............................................................................................................ 7

29 U.S.C. § 794(a) ...................................................................................................... 15

42 U.S.C. § 12101 ........................................................................................................ 7

42 U.S.C. § 12132 ...................................................................................................... 15

**Other Authorities**

U.S. Deparment of Justice Technical Assistance Manual, § II-5.1000 ......................... 16

U.S. Department of Justice Technical Assistance Manual § II-3.3000 ......................... 16

**Regulations**

28 C.F.R. § 35.150 ................................................................................................. 16

Defendant Andrew M. Cuomo, Governor of New York State ("Governor"), sued here in his official capacity, respectfully submits this memorandum of law and the Declaration of Tim Ruffinen, dated May 4, 2020 ("Ruffinen Decl."), in opposition to Plaintiffs' motion for a preliminary injunction.

## PRELIMINARY STATEMENT

During his daily COVID-19 press briefings, the Governor provides multiple means by which deaf individuals can access the important information conveyed during the briefings.  On his official website, www.governor.ny.gov/news, the Governor provides links to a live and recorded video presentation of his press briefings with an in-frame American Sign Language ("ASL") interpreter and a same-day transcript.  The live television broadcast of the press briefing uses closed captioning and PowerPoint slides, all of which visually convey the important information covered by the Governor and the day's panel of experts.

Plaintiffs, four deaf individuals and a non-profit organization that files claims to protect the rights of individuals with disabilities, contend these many and varied accommodations are unreasonable under federal law.  They assert that the law requires the Governor to go one step further by making the in-frame ASL interpretation now available on his website also available on the live television broadcast of his press briefings carried by the major networks and other cable news channels.  And they seek a preliminary injunction to mandate this change, which is the ultimate relief they request in the action.  The Court should deny Plaintiffs' motion for a preliminary injunction for multiple reasons.

*First*, Plaintiffs fail to meet the heightened standard for a mandatory injunction requiring them to show a clear or substantial likelihood of success on the merits.  Plaintiffs concede by the very relief they seek that, as a means of communicating the important information covered in the

press briefings, ASL interpretation provides a reasonable accommodation.  In light of this concession, Plaintiffs have no likelihood of success on the merits unless they can allege facts supporting a reasonable inference that they cannot access the ASL interpretation the Governor already provides on his website, and they allege no such facts.  Two of the individual Plaintiffs admit that they have access to the internet and the remaining two individual Plaintiffs allege merely that they do not own or use a computer, but do not allege any other facts to support a reasonable inference that they are unable to watch the ASL interpretation of the press briefings currently available online on other devices, such as a smart phone.  To the extent that the organizational Plaintiff, Disability Advocates, Inc. (d/b/a Disability Rights New York) ("DRNY"), asserts that it is authorized by federal statute to bring this action on behalf of other deaf individuals who cannot access the ASL interpretation online, that argument is without merit; DRNY has no such standing to assert the legal rights of others.  *See Disability Rights New York v. New York State*, No. 17-cv-6965, 2019 WL 2497907 at *5, 8-11 (E.D.N.Y. June 14, 2019).

Moreover, even if the individual Plaintiffs' allegations did permit a reasonable inference that they cannot access the ASL interpretation online, Plaintiffs would still fall far short of establishing a clear or substantial likelihood of success on the merits based on existing precedent. The only case decided by this Court involving a reasonable accommodation challenge to the means of communication by a government entity during an emergency provides no support for Plaintiffs' position.  *See Brooklyn Center for Independence of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 656 (S.D.N.Y. 2013) (Furman, J.) (holding no violation with respect to the means of communication in light of the "multiplicity of ways that the City communicates emergency information and lack of evidence that people with disabilities do not receive this information"). Plaintiffs fail to cite a single case lending support to their position that the multiple ways in

which the Governor ensures deaf individuals can access his briefings are insufficient. Accordingly, they fail to establish any likelihood of success on the merits, much less a likelihood of success that is clear or substantial.

*Second*, Plaintiffs will not suffer any irreparable harm if there is no mandatory injunction pending the resolution of the case. In essence, Plaintiffs' irreparable injury argument is the assertion that the individual Plaintiffs are unable to access the ASL interpretation currently available online and therefore will not obtain the important information conveyed to the general public during the briefings. For the reasons already discussed, there are no allegations in the complaint to support a reasonable inference that Plaintiffs are unable to access the ASL interpretation available online. In the absence of a basis to infer Plaintiffs have no such access, they have no basis to argue they will suffer any irreparable harm.

*Third*, the balance of equities does not tip in Plaintiffs' favor. Plaintiffs' argument that they suffer "immense hardship" in attempting to access the in-frame ASL interpretation available on the Governor's website is without support. *See* Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 4-1 ("Plaintiffs' MOL"), at 14. None of the Plaintiffs alleges or attests to any such hardship. On balance, the equities tip in favor of maintaining the status quo.

For these reasons, the Court should deny Plaintiffs' request for a preliminary injunction in its entirely. The Governor has made multiple accommodations to ensure deaf individuals can access his daily COVID-19 press briefings, including an in-frame ASL interpretation available on his official website during and after the briefings, closed captioning and frequent use of visual demonstrative aids on the live television broadcast, and same-day transcripts available online. These accommodations are more than reasonable and sufficient under federal law.

<u>**STATEMENT OF FACTS**</u>

**A.  The Governor's Daily COVID-19 Press Conferences**

On March 2, 2020, the Governor started holding a regular daily press conference on the COVID-19 public health emergency.  Ruffinen Decl. ¶ 4.  Since that date, the Governor has conducted this press conference daily, with the exception of March 14, 2020, when he held a phone call with the media.  *Id*. ¶ 5.  Information about the timing of the regular daily COVID-19 press conference is distributed via the Governor and New York State's social media platform and the Governor's e-mail distribution list, and is added to the Governor's website at least 30 minutes prior to the start of the regular daily COVID-19 press conference.  *Id*. ¶ 6.  Anyone can sign up for the e-mail distribution list to receive updates related to the COVID-19 public health emergency by visiting https://coronavirus.health.ny.gov/home.  *Id*. ¶ 7.

During the regular daily press conference, the Governor frequently utilizes a PowerPoint presentation.  *Id*. ¶ 8.  The presentation includes slides of facts and figures related to the COVID-19 public health emergency that are usually displayed as graphs or charts.  *Id*.  The presentation also includes slides containing text explaining important announcements related to the COVID-19 public health emergency.  *Id*.  For example, during the March 20, 2020 briefing, the Governor announced the stay-at-home executive order, referred to as "New York on PAUSE."  All of the important information about this order was conveyed on multiple PowerPoint slides that were displayed on a split screen as the Governor was speaking, including slides instructing viewers to "remain indoors to greatest extent to protect physical and mental health," listing the rules for the "most vulnerable groups" and "non-vulnerable populations," and advising that the restrictions

would be enforced through civil fines and mandatory closure of non-compliant businesses.[1] Similarly, the Governor's announcement during the April 15, 2020 COVID-19 press conference that residents are required to wear face masks in public was prominently conveyed on a split screen PowerPoint slide while the Governor was speaking.[2]

Since March 2, 2020, the Governor's Office and Media Services have provided closed captioning for all the Governor's regular daily press conferences addressing COVID-19. *Id*. ¶ 9. A person listens to the real time audio of the conference and transcribes what is being said. *Id*.

Since March 27, 2020, the Governor's Office has made a simultaneous ASL broadcast of these regular daily press conferences available via its webstream. *Id*. ¶ 10. This ASL broadcast contains a split screen of the Governor's briefing and the ASL interpretation. *Id*. The ASL broadcast is done by a Certified Deaf Interpreter ("CDI") to provide simultaneous ASL interpretation of the Governor's daily COVID-19 press conference. *Id*. ¶ 11. A CDI is a certified interpreter for ASL who possesses native fluency in ASL. *Id*. CDIs are the preferred method of ASL translation for the deaf community. *Id*. The Governor's Office notifies the public of this ASL interpretation daily. *Id*. ¶ 12. Specifically, prior to the start of each COVID-19 press conference, the Governor's Office advises New Yorkers about the simultaneous ASL interpretation through e-mail blasts and the Governor's social media accounts. *Id*. In addition, the link to the simultaneous ASL broadcast is prominently displayed on the Governor's website.

---

[1] *See* archived video of the television broadcast of the March 20, 2020 COVID-19 press briefing (available at https://www.youtube.com/watch?v=XxA4HL-I8sc&feature=youtu.be) at mark 10:24 (NY on PAUSE, 2 Rules), mark 11:13 (100 percent workforce reduction); mark 11:29 (rules for most vulnerable groups), mark 14:44 (rules for non-vulnerable populations), and mark 16:59 (enforcement through civil fines and closures).

[2] See archived video of the television broadcast of the April 15, 2020 COVID-19 press briefing (available https://www.youtube.com/watch?v=FeNECzGY11g&feature=youtu.be) at mark 30:21 ("All people in public in New York must have mask or mouth/nose covering").

*Id.* This simultaneous ASL interpretation has been reaching the deaf community. *Id.* ¶ 13. For example, on March 27, 2020, there were 1,103 views of the simultaneous ASL interpretation of the Governor's COVID-19 press conference. *Id.* On April 30, 2020, the standard webstream of the press conference received 66,682 views and the simultaneous ASL feed received 4,832 views. *Id.*

Following every daily COVID-19 press conference, the Governor's Office issues a press release that contains information relevant to the press conference through the Governor's website and the e-mail distribution list. *Id.* ¶ 14. In addition to the closed captioning, the simultaneous ASL broadcast, and the e-mail distribution list, the Governor's Office disseminates important information about the COVID-19 emergency via social media accounts on Facebook, Twitter, and Instagram. *Id.* ¶ 15. This information is often disseminated simultaneously with the Governor's regular daily COVID-19 press conference. *Id.* The Governor's Office also provides a written transcript of every regular daily COVID-19 press conference via the Governor's website and through e-mail distribution. *Id.* ¶ 16. These transcripts are typically posted no later than a few hours from the conclusion of the conference, and usually by 4pm on the day of the conference.[3] *Id.* ¶ 5. In addition, following every regular daily COVID-19 press conference, a video with simultaneous ASL interpretation is posted on the Governor's public facing YouTube page, which is also accessible via a link on the Governor's website. *Id.* ¶ 17.

**B.  Plaintiffs' Complaint**

Four individuals and DRNY filed this action against the Governor to challenge the means by which he communicates his daily COVID-19 press briefings under Title II of the Americans

---

[3] The Governor's Office posted on the Governor's website a transcript of the previously-referenced March 14, 2020 call held with the media in lieu of a daily press conference immediately after the call. *Id.* ¶ 5.

with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 794. *See* Complaint, ECF No. 1 ("Compl."), at ¶¶ 1, 14.

Plaintiff Martinez is a 30-year-old deaf individual who is fluent in ASL. *Id.* ¶¶ 50-51. He was raised in Colombia and learned to read and write Spanish before learning some English. *Id.* ¶ 52. He seeks out videos on social media platforms with ASL interpretation of the information covered in the Governor's press briefings in order to respond to questions he receives from other deaf community members. *Id.* ¶ 58. Plaintiff Nguyen is a 56-year-old deaf individual who learned ASL as a teenager and does not read, write, or understand English. *Id.* ¶¶ 60-61. He does not use a computer. *Id.* ¶ 62. The complaint is silent about whether he resides with anyone who uses a computer or whether he uses a smart phone or other device with a data plan or wifi connectivity. Plaintiff Hallenbeck is a 63-year-old deaf individual who is fluent in ASL and understands some English. *Id.* ¶¶ 67-68. He does not own a computer. *Id.* ¶ 71. The complaint is silent about whether he resides with anyone who owns or has access to a computer or whether he uses a smart phone or other device with a data plan or wifi connectivity. Plaintiff Wildberger is a 23-year-old deaf individual who is fluent in ASL. *Id.* ¶ 75. The complaint is silent about whether she understands and reads English. She has access to the internet. *Id.* ¶ 80.

Plaintiff DRNY alleges that it is authorized by federal statute to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals with disabilities. *Id.* ¶ 24. DRNY brings this action on behalf of itself and the four individual Plaintiffs pursuant to that alleged statutory authority. *Id.* ¶ 25.

Plaintiffs acknowledge that the Governor currently offers ASL interpretation of his live press conferences on the Governor's official website and that at least some of the television stations broadcasting his briefings provide closed captioning. *Id.* ¶ 39, 41. Plaintiffs allege the Governor is in violation of Title II of the ADA and Section 504 of the Rehab Act because he provides closed captioning and uses visual demonstrative aids on the live television broadcasts of his press conferences without also providing on those broadcasts the same ASL interpretation available on his website. *Id.* ¶¶ 95-97, 105.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986). Because of the extraordinary nature of the relief involved, a plaintiff is required to "carry the burden of persuasion by a clear showing for each factor." *Abbott Labs. v. Adelphia Supply USA,* No. 15 CV 5826, 2015 WL 10906060, at *5 (E.D.N.Y. Nov. 6, 2015), *aff'd sub nom. Abbott Labs. v. H&H Wholesale Servs., Inc*., 670 F. App'x 6 (2d Cir. 2016). Generally, a plaintiff seeking a preliminary injunction must show: "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *North American Soccer League, LLC v. United States Soccer Federation, Inc.,* 883 F.3d 32, 37 (2d Cir. 2018) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).

Where, as here, a plaintiff seeks a mandatory injunction - one that "alter[s] the status quo by commanding some positive act" - a higher standard applies. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). Plaintiffs seeking a mandatory injunction must show "a clear or substantial likelihood of success on the merits." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth*., 684 F.3d 286, 294 (2d Cir. 2012); *see also North American Soccer*, 883 F.3d at 37.

Plaintiffs acknowledge that they seek a mandatory injunction and must satisfy this heightened

standard.  *See* Plaintiffs' MOL at 11.[4]

## ARGUMENT

### I.    PLAINTIFFS FAIL TO DEMONSTRATE A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

The gravamen of Plaintiffs' case, and the basis for their requested injunction, is the

contention that the Governor has failed to provide reasonable accommodation for deaf

individuals with respect to the means of communicating his daily COVID-19 press briefings, in

violation of Title II of the ADA and Section 504 of the Rehab Act.  Plaintiffs have no clear or

substantial likelihood of success on the merits for two reasons.

First, Plaintiffs fail to state a claim under the ADA or Rehab Act because they fail to

allege facts sufficient to support a reasonable inference that they cannot adequately access the in-

frame ASL interpretation the Governor already provides on his official website, which is the

very form of accommodation they seek.  Two of the Plaintiffs concede they have internet access.

Compl. ¶¶ 58, 80.  The cursory allegations by the other two individual Plaintiffs that they do not

"use" or "own" a computer (Compl. ¶¶ 62, 71) are insufficient.  Nowhere in the complaint or

their declarations do they allege that they have no access to a computer with wifi that may be

owned by others in their households, could not obtain assistance from others to use a computer to

log onto the Governor's site, or cannot access the internet through some other device such as an

---

[4] Inexplicably, Plaintiffs assert on the very next page of their brief that they "need only show that there is a fair probability that they will prevail" on the merits to obtain a preliminary injunction. Plaintiffs' MOL at 12.  This is incorrect.  Because Plaintiffs seek a mandatory injunction, they must meet the heightened standard requiring that they show a clear or substantial likelihood of success on the merits.  *North American Soccer*, 883 F.3d at 37.

iPad, smart phone, or smart TV.  And DRNY has no standing to assert the rights of other deaf individuals.

Second, even if Plaintiffs' allegations were sufficient to support a reasonable inference that they cannot access the ASL interpretation provided on the Governor's website, the closed captioning available on the live television broadcast and the Governor's frequent use of PowerPoint slides to convey critical information constitute a reasonable accommodation as a matter of law, or at a minimum presents a sufficiently close question such that Plaintiffs' likelihood of success is far from clear or substantial.

These points are discussed in turn below.

**A. There is No Clear or Substantial Likelihood Plaintiffs Will Succeed on the Merits Because They Fail to Allege Facts that Support a Reasonable Inference They Are Unable to Access the ASL Interpretation Already Provided on the Governor's Official Website**

Plaintiffs' complaint fails to state a claim that would survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  A court reviewing a Rule 12(b)(6) motion must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (internal citations omitted).  A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although a court must accept all allegations contained in the complaint to be true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

Plaintiffs concede that providing in-frame ASL interpretation during the Governor's COVID-19 press briefings that is accessible to them would satisfy Title II of the ADA and Section 504 of the Rehab Act; indeed, that is the very relief they seek in this action. Plaintiffs' MOL at 1. They also concede that the Governor provides live in-frame ASL interpretation during his COVID-19 press briefings on his official website. Compl. ¶ 39. The in-frame ASL interpretation is also available on archived videos accessible on YouTube through a link provided on the Governor's website.[5] In order to state a claim for relief then, Plaintiffs must at least allege facts sufficient to support a reasonable inference that they are unable to access the ASL interpretation available on the Governor's website. This they have not done.

Plaintiff Martinez alleges that he "seek[s] out videos on social media platforms with ASL interpretation of the information covered by" the Governor's press briefings after the fact. Compl. ¶ 58; Martinez Decl. ¶ 7. This allegation establishes that Plaintiff Martinez has access to the internet and can, if he so chooses, either watch the press briefings live on the Governor's site with in-frame ASL interpretation or watch them later at his convenience through the YouTube link provided on the Governor's website. Accordingly, Plaintiff Martinez's allegations fail to state a claim under the ADA or Rehab Act because the Court may not reasonably infer from his allegations that he is unable to access the live in-frame ASL interpretation already provided online. *Matson*, 631 F.3d at 63.

---

[5] The Governor's website provides, *inter alia*, a link for constituents to watch videos of past press briefings "with ASL interpretation available on YouTube." *See, e.g.,* https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-amid-ongoing-covid-19-pandemic-governor-cuomo-announces-16. The Court may take judicial notice that this material is available on the Governor's official website. *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (noting courts have taken judicial notice of documents filed with government entities and available on their official websites).

Plaintiff Wildberger alleges that she "has access to the internet," but without any elaboration claims she has not been able to stream the live ASL interpretation on the Governor's website and has found the ASL interpreter on the Governor's website to be "frequently not available." Compl. ¶ 80; Wildberger Decl. ¶ 6. She also alleges that she "would be able to understand Governor Cuomo's briefings if televised ASL interpretation were provided," offering no plausible explanation for why she would have a better understanding of the ASL interpretation if she watched it on the television broadcast as opposed to the Governor's website. In the absence of any explanation as to why Plaintiff Wildberger was unable to stream the live ASL interpretation on the Governor's website, what it means for the ASL interpreter to be "not available," or why she would have a better understanding of the ASL interpretation viewed on a television screen versus over the internet, the Court should not accept her conclusory statements that she was unable to access or understand the live ASL interpretation provided on the Governor's website, *Iqbal*, 556 U.S. at 678, and cannot reasonably infer that she is unable to derive the benefits of the live ASL interpretation the Governor already provides. *Matson*, 631 F.3d at 63. Moreover, even if the Court were to credit Plaintiff Wildberger's conclusory statement that she is unable to access or understand the *live* ASL interpretation provided during each press briefing on the Governor's website, there is no basis in the complaint for the Court to reasonably infer that Plaintiff Wildberger has any issue with accessing the YouTube video with ASL interpretation posted within a short time after the conclusion of each briefing available through a link provided on the Governor's website. Ruffinen Decl. ¶ 17. Accordingly, Plaintiff Wildberger's allegations fail to state a claim under the ADA or Rehab Act because the Court may not reasonably infer from her allegations that she is unable to access the in-frame ASL interpretation already provided online. *Matson*, 631 F.3d at 63.

The allegations for the two remaining individual Plaintiffs similarly fall short, even though they do not concede internet access like the allegations for Plaintiffs Martinez and Wildberger. Plaintiff Nguyen alleges he "do[es] not *use* a computer and *therefore* cannot access the internet." Nguyen Decl. ¶ 5 (emphasis added). Similarly, Plaintiff Hallenbeck alleges that he "do[es] not *own* a computer and *therefore* cannot access the Governor's briefings online." Hallenbeck Decl. ¶ 6 (emphasis added). However, the Court should reject the conclusory statements that these Plaintiffs cannot access the internet merely because they do not "use" or "own" a computer. Notably, they fail to allege that there is no one in their households who possesses a computer or that they do not have access to any other device, such as a smart phone, that would enable them to access the ASL interpretation available on the Governor's website. Therefore, the Court cannot reasonably infer based on the mere assertion that they do not "use" or "own" a computer that they are unable to access the ASL interpretation online. *Matson*, 631 F.3d at 63.

Finally, Plaintiff DRNY is without standing to assert claims on behalf of other, unnamed deaf individuals who may in theory have no access to the live or recorded ASL interpretation available on the Governor's website. DRNY alleges that it is the New York State Protection & Advocacy System ("P&A System") with the authority to "file claims of abuse, neglect, and rights violations on behalf of individuals with disabilities . . . ." Compl. ¶¶ 24-25. To the extent DRNY will argue that, as a P&A System, it has standing to assert claims on behalf of other third parties who could potentially allege, unlike the named individual Plaintiffs, that they are deaf and without any ability to access the ASL interpretation on the Governor's official website, that legal theory of standing has already been soundly rejected. In *Disability Rights New York v. New York State*, No. 17-cv-6965, 2019 WL 2497907 (E.D.N.Y. June 14, 2019), DRNY and an individual

plaintiff on his own behalf and on behalf of a purported class of others similarly situated, alleged that the state defendants failed to timely discharge adults with disabilities from residential schools where they lived to a more integrated community setting in violation of the ADA and Rehab Act. *Id*. at *1. In a comprehensive opinion, the court rejected DRNY's assertion that its authorization as a P&A System overcomes the prudential standing rule prohibiting a litigant from raising another person's legal rights.[6] *Id*. at *5, 8-11 ("To overcome [the third-party bar] and assert the rights of the mentally disabled in New York, DRNY was required to show that an exception to that prohibition applied. . . . It did not, and its claims must be dismissed.") (internal citation omitted). There is no clear or substantial likelihood that the same standing argument would fare any better in this case.

*   *   *

Absent any allegations in the complaint that would support a reasonable inference the Plaintiffs are unable to access the live or recorded ASL interpretation available on the Governor's official website, Plaintiffs have no clear or substantial likelihood of surviving a Rule 12(b)(6) motion to dismiss. *North American Soccer*, 883 F.3d at 37.

> **B. There is No Clear or Substantial Likelihood Plaintiffs Will Succeed on the Merits Because the Governor's Multiple Accommodations for the Deaf Are Not Unreasonable Under the ADA and Rehab Act**

Even if the Plaintiffs had alleged facts to support a reasonable inference that they have no ability to access the in-frame ASL interpretation on the Governor's official website (which is not

---

[6] In *Disability Rights*, DRNY eschewed any reliance on associational standing as a basis for asserting the legal rights of third parties. *Id*. at *7 (noting DRNY has "disavowed . . . any attempt to show that it has associational standing"). So too here. DRNY alleges merely that as a P&A System it is authorized to assert claims on behalf of others and asserts no facts in the complaint to establish that it possesses the requisite "indicia of membership" for associational standing. Compl. ¶¶ 24-25.

the case), they would still fail to establish a clear or substantial likelihood of success on the merits because there is no case law that supports their position.

Title II of the ADA provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehab Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Standards under, and requirements imposed by, the Rehab Act and the ADA are effectively the same, and claims under the two statutes are generally treated identically and in tandem. *See, e.g.*, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

To prevail on an ADA claim, plaintiffs must establish that: (1) they are qualified individuals with disabilities; (2) the defendant is subject to the ADA; and (3) they were denied the opportunity to participate in or benefit from the defendant's services, programs or activities, or were otherwise discriminated against by the defendant, by reason of their disabilities. *Williams v. City of New York*, 121 F. Supp. 3d 354, 364 (S.D.N.Y. 2015) (VEC) (citing *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196-97 (2d Cir. 2012)); *Henrietta D.*, 331 F.3d at 272. To establish a claim under the Rehab Act, plaintiffs must also establish that the defendant receives federal funding. *Williams*, 121 F. Supp. 3d at 364 (citing *Henrietta D.*, 331 F.3d at 272).

"[T]he disabilities statutes do not guarantee any particular level of . . . care for disabled persons, nor assure maintenance of service previously provided." *Lincoln CERCPAC v. Health and Hosps. Corp.*, 147 F.3d 165, 168 (2d Cir. 1998); *Rodriguez v. City of New York*, 197 F. 3d 611, 618 (2d Cir. 1999). The "relevant inquiry" instead focuses on meaningful access, asking "not whether the benefits available to persons with disabilities and to others are actually equal, but whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled." *Henrietta D.*, 331 F.3d at 273.

Meaningful programmatic access likewise does not guarantee equality of results. *See Alexander v. Choate*, 469 U.S. 287, 299 (1985); *United Spinal Ass'n v. Bd. of Elections in the City of New York*, 882 F. Supp. 2d 615, 623 (S.D.N.Y. 2012) (noting "[i]t is well-established in this Circuit that . . . the ADA and its implementing regulations do not require "equal access" or "equal results" for individuals with disabilities"); U.S. Department of Justice ("DOJ") Technical Assistance Manual § II-3.3000 ("The ADA provides for equality of opportunity, but does not guarantee equality of results.") (available at https://www.ada.gov/taman2.html#II-1.3000). Meaningful programmatic access means accessibility of the program when viewed in its entirety. *See* 28 C.F.R. § 35.150 (requiring accessibility of the program "when viewed in its entirety"); DOJ Technical Assistance Manual, § II-5.1000 (explaining that meaningful access should be evaluated in the context of services, programs, or activities, when viewed in their entirety).

The ADA and Rehab Act do not contemplate perfectly accessible service in every respect. *See Midgett v. Tri-County Metro. Transp. Dist.*, 254 F.3d 846, 849 (9th Cir. 2001) (holding that regulations implementing the ADA do not contemplate perfect service for wheelchair-using bus commuters and that isolated or temporary problems are not violations of

the ADA); *Stephens v. Shuttle Assocs., L.L.C.*, 547 F. Supp. 2d 269, 278 (S.D.N.Y. 2008) (acknowledging that the ADA cannot regulate individuals' conduct in every situation and dismissing ADA claim based on an isolated incident); *Stauber v. N.Y. City Transit Auth.*, 10 A.D.3d 280, 282 (N.Y. App. Div. 1st Dep't 2004) (noting ADA and its implementing regulations "do not contemplate perfect service for wheelchair-using bus commuters.").

While there are many cases addressing the need for government actors to provide reasonable accommodations to the deaf in other contexts, such as arrests, court appearances, and correctional facilities (*see, e.g.*, *Williams*, 121 F. Supp. 3d at 359 (arrests); *Prakel v. Indiana*, 100 F. Supp. 3d 661, 666 (S.D. Ind. 2015) (court proceedings); *Wright v. New York State Dep't of Corrections*, 831 F.3d 64, 73 (2d Cir. 2016) (correctional facilities)), cases addressing the need for governments to provide reasonable accommodation when communicating with the public during emergencies are few and far between. This Court has spoken on the issue only once before, in *Brooklyn Center for Independence of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588 (S.D.N.Y. 2013). In *Brooklyn Center*, the plaintiff brought a class action suit against New York City to challenge to the City's emergency and disaster plans developed in the wake of Hurricanes Irene and Sandy for failing to address the needs of individuals with disabilities. *Id.* at 595-96. In a lengthy decision following a bench trial, Judge Furman addressed in detail each aspect of the City's emergency and disaster plans under the standards of Title II of the ADA and Section 504 of the Rehab Act, including the means of communicating with deaf individuals during an emergency. *Id.* at 655. The court found that the City utilized in its plans a "wide variety of methods," including press conferences and websites, to communicate information during an emergency. *Id.* The court determined that "[m]ost, if not all, of these means are accessible to people with disabilities," noting the policy of using ASL interpreters for important press

conferences, the accessibility of the City's websites, and the availability of 311 to the deaf via

TTY. *Id*. The court held the City's means of communication did not violate the ADA or Rehab

Act:

> None of these means of information distribution is perfect. Press conferences may not always be closed-captioned . . . . But the multiplicity of means by which information is distributed ensures that people with disabilities have an equal opportunity to access emergency information as those without disabilities.

*Id*. (citing *Loye v. Cnty. of Dakota*, 625 F.3d 494, 499-501 (8th Cir. 2010)).

Particularly relevant to this case, the plaintiffs in *Brooklyn Center* identified only one

person with disabilities who was insufficiently warned of Hurricane Sandy's approach because

he did not have a computer, watch television, or listen to the radio in the days leading up to the

storm. *Brooklyn Center,* 980 F. Supp. 2d at 655. The Court held it was not the individual's

disabilities that prevented him from receiving the City's emergency information because "a

person without disabilities who did not use a computer, watch television, or listen to the radio

would also likely not have received information that a storm was approaching." *Id*. at 655-56.

The Court concluded the plaintiffs "provided no evidence that the means of communication

employed by the City during an emergency are any less effective at reaching people with

disabilities as those without." *Id*. at 656. The same is true here. To the extent a deaf individual

chooses not to take advantage of the various means by which the Governor communicates

critical information during his press briefings – through closed captioning and demonstratives

during the television broadcast and video with ASL interpretation and same-day transcripts

available on the Governor's official website – it is not the individual's disabilities that prevent

him from receiving the information because a person without disabilities who did not avail

himself of these various means would similarly not receive such information.

Notably, the court acknowledged that there was "certainly room for the City to improve on its plans with respect to the means of communicating emergency information," citing as examples the fact that the City's policy of using ASL interpretation at press conferences is "not memorialized in the City's emergency plans themselves and is limited by its terms to the Mayor's press conferences" and that the use of closed captioning in televised warnings is recommended but not required by the plans.  *Id*.  Nevertheless, in light of the "multiplicity of ways that the City communicates emergency information and lack of evidence that people with disabilities do not receive this information," the court held "these shortcomings are not enough in themselves to constitute a violation of the ADA."  *Id*.

Judge Furman's analysis applies with equal force here.  The Governor employs a "multiplicity of ways" to ensure that deaf individuals can access the important information he conveys during his daily COVID-19 briefings.  He provides live in-frame ASL interpretation of his briefings on his official website, which can also be viewed after the briefings are over on YouTube accessible through a link provided on the Governor's website.  The televised broadcasts of his briefings carried by all of the major networks and other cable television stations provide closed captioning.  During the briefings, the Governor regularly uses PowerPoint slides containing charts, graphs, and text to convey visually all of the critical information discussed during the briefings.  In fact, the PowerPoint slides used during the press briefings held on March 20, 2020 and April 15, 2020 prominently displayed in writing information about the stay-at-home order and face mask requirement (*see, supra*, at 4-5) -- information that Plaintiffs Hellenbeck and Wildberger allege they did not learn about from watching the press briefings on television.  *See* Hellenbeck Decl. ¶ 8 (stay-at-home order); Wildberger Decl. ¶ 7 (face mask requirement).  Finally, the Governor posts on his site a same-day transcript of the briefings.

Plaintiffs fail to allege that they are unable to access the internet on any device, including an iPad, smart phone, or smart TV, in order to watch the ASL translation or review the same-day transcript, or receive the most important information from the briefings on television conveyed through closed captioning and the Governor's PowerPoint slides.[7]  Plaintiffs insist the Governor must provide in-frame ASL interpretation not just on his official website, but also as part of the live television broadcast.  But they are entitled only to a *reasonable* accommodation under the ADA and Rehab Act, not a *perfect* accommodation.  Based on the facts alleged in the complaint conceding the multiplicity of ways deaf individuals can access the critical information conveyed during the Governor's COVID-19 press briefings, Plaintiffs fail to state a claim under Title II of the ADA or Section 504 of the Rehab Act.  *Brooklyn Center*, 980 F. Supp. 2d at 655 (holding no violation of the ADA despite noting none of the City's means of information distribution "is perfect"); *see also Midgett*, 254 F.3d at 849 (holding regulations implementing ADA do not contemplate perfection).

Even if the Court does not conclude based on the allegations in the complaint that the multiplicity of ways the Governor makes his COVID-19 press briefings accessible to the deaf constitute a reasonable accommodation under the ADA and Rehab Act, at a minimum the Court should hold Plaintiffs fall far short of meeting their burden on this motion of establishing a clear or substantial likelihood of success on the merits.  Plaintiffs fail to cite a single case involving reasonable accommodation for the deaf in the context of press briefings during an emergency, let alone a case suggesting that a television broadcast with closed captioning and frequent use of visual demonstratives is legally insufficient and *must* be accompanied by in-frame ASL

---

[7] To the extent the Plaintiffs assert that they cannot understand the closed captioning because it contains "frequent errors and omissions" (*see* Hallenbeck Decl. ¶ 5), they ignore the PowerPoint slides that convey the same information.

interpretation.  The only case addressing the issue from this Court, *Brooklyn Center*, compels the opposite conclusion – that the multiplicity of ways the Governor communicates the critical information from his press briefings are more than legally sufficient.

The only other case to address the means of government communication during an emergency under the ADA and Rehab Act similarly offers no support to Plaintiffs.  In *Loye*, deaf plaintiffs were provided temporary housing after their neighborhood was contaminated with mercury.  625 F.3d at 495.  The county held a number of large-group meetings with residents, including the plaintiffs, to convey important information about the decontamination process and associated health issues.  *Id.* at 498.  The plaintiffs alleged the county violated the ADA and Rehab Act, as well as the Minnesota Human Rights Act, because there was no ASL interpreter at some of the meetings, and at other meetings the ASL interpretation was "imperfect" because the interpreter spent time interpreting individual discussions instead of interpreting the large-group discussion.  *Id*.  The Eighth Circuit affirmed the district court's grant of summary judgment for the county, holding in relevant part that the ADA and Rehab Act did not require the county to provide an ASL interpreter at *every* meeting because based on the interpretation services that were provided the county "effectively communicated" the relevant information to the plaintiffs at the large-group meetings.  *Id*. at 499.

Because the Plaintiffs fail to cite "a single precedent" that stands for the proposition they ask the Court to adopt, they "have not come close to establishing a clear likelihood that the law entitles them to success on the merits of their" claim.  *Bergamaschi v. Cuomo*, No. 20-cv- 2817 (CM), 2020 WL 1910754 at *15 (S.D.N.Y. April 20, 2020) (denying preliminary injunction application to require the state parole board to include a bond hearing as part of its parole

revocation procedures in the absence of any precedent supporting such a requirement under the Due Process Clause).

## II.    PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM IN THE ABSENCE OF A MANDATORY INJUNCTION

Irreparable harm requires showing that an "actual and imminent" injury will occur that "cannot be remedied if a court waits until the end of trial to resolve the harm." *Singas Famous Pizza Brands Corp. v. New York Adver. LLC*, 468 F. App'x 43, 45 (2d Cir. 2012); *accord Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005). In evaluating whether the plaintiff will suffer imminent harm, "the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits . . . ." *Weinstein v. Krumpter*, 120 F. Supp. 3d 289, 297 (E.D.N.Y. 2015) (quotation omitted). "At the preliminary injunction stage, the only cognizable harms are those that cannot be remedied at the end of trial if the movant were to prevail." *Freedom Holdings*, 408 F.3d at 115.

Plaintiffs assert they will suffer irreparable harm pending the resolution of this case unless the Governor is required to provide in-frame ASL interpretation during the television broadcast of the COVID-19 press briefings because they will be unaware of critical information about fighting the virus, including how to stay safe and healthy, and "may face consequences" as a result. Plaintiffs' MOL at 13. This argument assumes that Plaintiffs are incapable of obtaining this critical information from the Governor's press briefings absent in-frame ASL interpretation during the television broadcast. As discussed above, *supra* Point I.A, this assumption is without factual basis in the complaint. Plaintiffs Martinez and Wildberger concede they have internet access and can therefore watch the press briefings on the Governor's official website with in-frame ASL interpretation. Plaintiffs Nguyen and Hallenbeck allegedly do not own or use a computer, but those allegations without more do not reasonably infer that they cannot access the

internet. There are many devices other than a computer, including an iPad, smart phone, and smart TV, that will enable a user to access the internet and thereby provide access to the Governor's press briefings on his official website with in-frame ASL interpretation. Plaintiffs do not need a preliminary injunction to avoid the alleged harm – they just need to watch the briefings online instead of on television. Plaintiffs' allegations and declarations offer no reason why they cannot do so right now in order to obtain the critical information they allegedly need to avoid irreparable harm even in the absence of a preliminary injunction.

Because Plaintiffs' allegations and testimony fail to support a reasonable inference that they cannot access the critical information conveyed at the press briefings given the current availability of ASL interpretation online, they will not suffer any "actual and imminent" harm in the absence of a preliminary injunction. *Singas Famous Pizza Brands Corp.*, 468 F. App'x at 45; *accord Freedom Holdings*, 408 F.3d at 115.

### III.  THE BALANCE OF EQUITIES DOES NOT TIP IN PLAINTIFFS' FAVOR

A court may award preliminary injunctive relief only if "the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)); *see also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (quoting *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982)).

Plaintiffs assert without elaboration that they suffer "immense hardship" because they and other deaf individuals "need to take multiple extra steps to access the live ASL stream of the press briefings, and many do not even know this stream is available or have internet access" or

"have the skill or technology to access this online stream."  Plaintiffs' MOL at 14.  None of this finds any support in the complaint or Plaintiffs' declarations.  To the contrary, Plaintiff Martinez has no difficulty searching online for videos on social media platforms with ASL interpretation of the information covered in the Governor's press briefings.  Martinez Decl. ¶ 7.  Plaintiff Wildberger attests that she has "access to the internet."  Wildberger Decl. ¶ 6.  While she claims (inconsistently) both that she has not been able to "successfully stream the live ASL interpretation offered on the Governor's website" and that she has "found the ASL interpreter on the Governor's website to be frequently unavailable," she does not claim that she lacks the skill or technology to access the Governor's website.  *Id*.  Plaintiffs Nguyen and Hallenbeck testify they do not own or use a computer (Hallenbeck Decl. ¶ 6; Nguyen Decl. ¶ 5), but neither states that they are unable to access the internet on any other device such as an iPad, smart phone, or smart TV, or that they lack the skill or technology to do so.

Accordingly, the balance of the equities tips against having this Court issue a preliminary injunction that would change the status quo; at present, Plaintiffs and other deaf individuals can avail themselves of a multiplicity of ways to access the important information conveyed during the Governor's press briefings, including through ASL interpretation and same-day transcripts on the Governor's website and closed captioning and PowerPoint slides on the television broadcast.

## <u>CONCLUSION</u>

For the reasons set forth above, the Governor respectfully requests that the Court deny

Plaintiffs' motion for a preliminary injunction in its entirety and grant such other and further

relief as the Court deems just and proper.

Dated:  New York, New York
      May 4, 2020

                            LETITIA JAMES
                            Attorney General
                            State of New York


                            By:_____/s/_ Andrew Amer_____
                            Andrew Amer
                            Special Litigation Counsel
                            28 Liberty Street
                            New York, New York 10005
                            (212) 416-6127
                            andrew.amer@ag.ny.gov

                            Attorney for Defendant